James R. SIAS, Plaintiff–Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant–Appellee.

No. 86–2117.

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 8, 1987.

Decided Nov. 22, 1988.

Gary T. Neal, McCroskey, Feldman, Cochrane, and Brock, Grand Rapids, Mich., for plaintiff-appellant.

John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Robert E. Hanson, Chicago, Ill., for defendant-appellee.

Before NELSON and NORRIS, Circuit Judges, and PECK, Senior Circuit Judge.

PER CURIAM.

This is a social security disability case involving a claimant who smokes two packages of cigarettes per day, is overweight, and has a serious circulatory problem. An administrative law judge decided that the claimant was not entitled to benefits. That decision became the final decision of the agency, and the claimant filed suit in federal court. On cross-motions for summary judgment, the district court (Wendell A. Miles, J.) concluded that there was substantial evidence to support the denial of benefits; judgment was therefore entered in favor of the Secretary. Finding ourselves in full agreement with the conclusion reached by Judge Miles, we shall affirm the judgment.

I

The claimant, who is 5 feet 9 inches tall and weighs approximately 245 pounds, was born on August 1, 1941. He has an eleventh grade education and has worked as an insurance agent, sales agent, car sales floor manager, warehouse supervisor, shipping/receiving clerk, hi-lo driver, and stock boy. He left his last job, that of insurance agent, in December of 1982.

The medical record shows that the claimant was hospitalized for an appendectomy in January of 1983. He was hospitalized again in March of that year because his lower left leg was becoming increasingly enlarged. A venogram showed acute thrombophlebitis with numerous tortuous veins, consistent with post-thrombotic syndrome. An anti-coagulant was prescribed, and the claimant's physician, a Dr. Keller, recommended that he wear support hose and reduce his body weight. The claimant was discharged from the hospital with a "fairly good" prognosis.

On November 14, 1983, Dr. Keller signed an insurance form on which he indicated that the claimant was totally disabled from performing any occupational duties. The anticipated date of return to work was shown as "unknown."

In a telephone contact on January 6, 1984, the claimant told a Social Security representative that he could walk, but that he had to keep his leg up a good part of the day. He further stated that at times one leg would be as much as eight inches larger than the other, and his ankle would overlap his shoe.

In January of 1984 the claimant underwent a bilateral venous evaluation. The results were "consistent with a deep venous thrombosis," and the condition was said to be chronic.

On February 11, 1984, Dr. Keller reported that the claimant's condition had not improved. The claimant was said to have extensive brawny edema, stasis dermatitis and superficial varicosities in his left leg, but no persistent or recurrent ulceration.

On March 8, 1984, a Dr. Vicencio examined the claimant at the request of the state agency. Dr. Vicencio's diagnosis included status-post thrombophlebitis in the left leg, with post-phlebitic changes. He concluded that the claimant's pain was con-

sistent with post-phlebitic syndrome, and that this was probably a permanent problem. Dr. Vicencio said that the swelling could be diminished with the use of support stockings, and that the claimant should avoid trauma to the left leg and excessive walking, standing, or staying in one position.

On September 4, 1984, Dr. Keller wrote a letter to the claimant's attorney stating that since the claimant had deep vein thrombosis of his left lower extremity,

> "it is possible that there may be periods of time when elevation of his left leg for at least ten minutes out of every hour would be medically advisable. However, if Mr. Sias continues to wear his support hose when ambulating, and is reasonably careful with his physical activities, then this hourly elevation should not be routinely necessary."

Three months later, in another letter to the attorney, Dr. Keller said the claimant's condition had not improved and it was therefore medically advisable for him to elevate his left lower extremity at least ten minutes per hour.

The final item in the medical record is a brief instruction written by a Dr. De-Longpre on March 12, 1985, after the ALJ had rendered his decision. The note, which was provided to the Appeals Council, said "elevate [left] leg 30 degrees for 30 minutes four times a day and always elevate [left] leg while sitting."

The claimant applied for benefits on December 28, 1983, alleging a disability onset date of December 1982. A hearing was held before the ALJ on August 9, 1984. The claimant testified at that time that he had stopped working in December of 1982 because of abdominal pains; these were followed by the appendectomy early in 1983. His thrombophlebitis became apparent in March, after he was back on his feet again, and this development led to the second hospitalization. The claimant testified that he has been treated with medication and has not been in the hospital since March of 1983, "but there's been no improvement, you know, on an outpatient basis." He continued to experience "[s]well-

ing, discomfort, weakness" in his left leg and had to "keep it up the majority of the time." He said his doctor had "told [him] to keep it up the majority of the time." The doctor also told him "that we have got things fairly well stabilized, but if we're not careful we could have a very quick life-threatening situation."

In spite of the life-threatening nature of his condition, the claimant admits he has not followed the instructions of his physician to wear support hose: "[y]ou're looking at roughly close to a hundred dollars," he testified, and "[a] pair of those support hose lasts approximately two to three months." The claimant has found it possible to buy two packs of cigarettes a day, however. His doctor has told him about the relationship between smoking and thrombosis, but the claimant has continued to smoke.

As for the limitations his condition has imposed, the claimant testified that he cannot walk very far; he would "be all wore out by the time [he] got around the block." His ability to stand "[d]epends if [he] can get something to lean on. In other words, not very long." When sitting, he said, he would probably have to get up at least three times an hour.

Within the year prior to the hearing, the claimant took an automobile trip that required him to drive 320 miles. He also said that he went fishing two months before the hearing. His social activities consist of "an occasional game of cards, which you know isn't very often anymore. I guess going to church on Sunday is about it right now." He also stated that he goes to the store occasionally.

The claimant said that he could perform an eight-hour-a-day job that required him to sit or stand and not lift more than 10 pounds occasionally "[if] it was very flexible as far as my moving around and setting." He said he probably could do insurance sales work, but "it's hard to find a person that'll let you ... move around like I have to move around...."

A vocational expert, John Petrovich, expressed the opinion that there were over

150,000 jobs the claimant could perform in the regional economy:

"Security guard. There are approximately 8,000 of these positions in the regional economy. Self service gas station attendant. 9,000 of these positions. Gross inspection, approximately 9,000. Non-retail clerking positions, approximately 125,000."

The ALJ appears to have thought that Mr. Petrovich did not adequately address the claimant's ability to work. Accordingly, and because the claimant submitted additional medical evidence after the hearing, a supplemental hearing was held on December 6, 1984. A second vocational expert, Michael Simmons, testified at that time.

Vocational Expert Simmons concluded that the claimant could not perform any of his past relevant work, but that there were other entry level jobs he could perform. These included:

"Account clerk, 12,000. Order clerk, 5,000. Postal clerk, 9,000. Receptionist, 15,000. Dispatcher, 2,500. Telephone sales, 10,000. Those are not—those are not unskilled jobs, all of them. But, he does certainly have the skills from his previous employment."

The ALJ asked Mr. Simmons if he had taken into account the claimant's presumed need "to elevate his leg most of the time." Mr. Simmons responded roughly as follows:

"Well, those are inside office type positions and very sedentary jobs and that's not a situation where people are going to be required to sit at a certain type of work station. I have clients that are in wheelchairs that are doing some of those jobs for different employers and the employers are generally INAUDIBLE or accommodating INAUDIBLE office setting or manufacturing settings as far as making accommodations like that."

On January 30, 1985, the ALJ filed a decision denying benefits. On the basis of the medical reports and the testimony at the two hearings, the ALJ found:

"The claimant has alleged that he is unable to work because of intractable pain located in his left leg, that he must keep his leg elevated most of the time, and that he must stand to change his position approximately three times an hour. He stated that although he is no longer able to function on a day-to-day basis as he once did, he is able to drive, to help with light housework, to go shopping for groceries occasionally, and to attend church services. The medical reports of record document that the claimant has a severe cardiovascular impairment consisting of chronic deep vein thrombosis of his left lower extremity and that he is required to wear support hose and keep his left foot elevated for approximately 10 minutes out of every hour. The claimant's physician has suggested that the use of support hose might decrease the frequency of the need for elevation of his leg. Accordingly, the undersigned finds that although the claimant may require elevation of his leg for up to 10 minutes out of every hour and that he may experience some discomfort, the medical reports of record do not document the need to elevate the leg most of the time as the claimant has alleged. Accordingly, the undersigned finds that the claimant's testimony concerning intractable pain in his left lower extremity and his allegation that he must keep his leg elevated most of the time throughout the day is less than fully credible."

The ALJ concluded that although claimant's impairment was severe, it did not meet or equal the requirements of the "listings" set forth in the governing regulations. He further concluded:

"The claimant is limited to the performance of work activity which does not require prolonged walking and/or standing or lifting in excess of 10 pounds frequently or 25 pounds occasionally. In addition, he must keep his left leg elevated 10 minutes and change positions three times during every hour. The claimant cannot return to his past relevant work."

The ALJ found that the claimant had skills "which with the exertional and nonexertional limitations heretofore described are transferable to such jobs as account clerk,

order clerk, postal clerk, receptionist, dispatcher, telephone sales person." This conclusion was supported by testimony at the supplemental hearing to the effect that there are over 50,000 jobs that the claimant can perform.

The Appeals Council denied review, and the claimant sued in the district court. The district court entered summary judgment for the Secretary, and this appeal followed.

## II

The claimant challenges the following credibility determination made by the ALJ:

"The claimant's objective complaint of intractable pain and the need to elevate his left lower leg most of the day are not supported by the medical evidence and consequently are not fully credible."

In *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 853 (6th Cir. 1986), we said that we would evaluate complaints of pain thus:

"First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain."

*See also Shavers v. Secretary of Health & Human Services,* 839 F.2d 232 (6th Cir. 1987). The Secretary concedes that there is an underlying medical condition, but argues that there is no objective evidence confirming the severity of the alleged pain.

There is substantial evidence to support the Secretary's determination.[1] Dr. Keller gave the claimant a fairly good prognosis at the time of his hospital discharge in March 1983. Contrary to the claimant's testimony that his doctor had told him to keep his leg elevated a majority of the time, two letters from the treating physician said that the leg should be elevated for 10 minutes per hour. Dr. Vicencio, the state's consulting physician, found plaintiff's pain consistent with post-phlebitic syndrome, but imposed restrictions only on excessive walking, standing, or staying in one position. The most recent instruction, from Dr. DeLongpre, is undercut, to a degree, by the absence of underlying objective findings or corroborative clinical evidence. We cannot determine from the record why the claimant saw Dr. DeLongpre. We do not know whether Dr. DeLongpre has actually examined the claimant, nor do we know anything of Dr. DeLongpre's qualifications to treat thrombophlebitis. Finally, even if one accepts Dr. DeLongpre's statement that the claimant needs to keep his left leg elevated all the time when he is seated, that would not alter the second vocational expert's testimony as to the jobs the claimant could perform with this restriction, given some cooperation on the employer's side. The prospects for "moderate employer accommodation" are not something to which the Secretary or the courts must turn a blind

1. This court reviews the Secretary's denial of a claim to determine whether the Secretary's findings are supported by substantial evidence. 42 U.S.C. §§ 1383(c)(3), 405(g). Substantial evidence means more than a mere scintilla of evidence; it means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The evidence "must do more than create a suspicion of the existence of the fact to be established.... [i]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Board v. Columbian Enameling & Stamping Co., Inc.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). Substantiality of the evidence must be based upon the record taken as a whole, *Futernick v. Richardson,* 484 F.2d 647 (6th Cir.1973), and in determining the question of substantiality of evidence, the reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim. *Whitson v. Finch,* 437 F.2d 728, 732 (6th Cir.1971). The court "may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence." *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978).

eye. See *Auer v. Secretary,* 830 F.2d 594, 596 (6th Cir.1987).

The claimant's style of life is not consistent with that of a person who suffers from intractable pain or who believes his condition could develop into "a very quick life-threatening situation." The claimant admitted to the ALJ that he was at least 40 pounds overweight; ignoring the instructions of his physician, he has not lost weight. He claims he has not worn the support hose his physician prescribed to alleviate swelling because support hose would cost too much—yet the claimant admits that against the advice of his doctor he smokes two packs of cigarettes a day. Taking judicial notice of the monetary cost of this dangerous habit, we calculate that the cost of the hose could have been covered by the savings the claimant would realize if he gave up cigarettes.

As to the health cost of a two-pack-a-day habit, the claimant argues that "there is no medical evidence in the record establishing a relationship between the plaintiff's impairment and cigarette smoking." Again, however, we can take judicial notice of the massive body of medical opinion supporting the advice the claimant received from his doctor on the subject of cigarette smoking.[2]

The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege—but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

## III

The claimant also argues that there is not substantial evidentiary support for a finding by the ALJ that there are over 50,000 jobs that the plaintiff can perform. Relying on *Roberson v. Ribicoff,* 299 F.2d 761 (6th Cir.1962), which held that a mere theoretical ability to engage in gainful activity is not enough to deny benefits if no reasonable employment opportunity is available, the claimant argues that Mr. Simmons, the vocational expert who testified at the supplemental hearing, did not provide evidence of actual jobs that claimant could perform.

Mr. Simmons, who has been a vocational counselor since 1967, testified that he had no personal knowledge of any employed individual working with one leg elevated on a frequent basis, but that it was his expert opinion that employers do try to accommodate workers with restrictions. He cited as an example an employer who hired a person in a wheelchair. The claimant argues that "there is a significant difference between an individual confined to a wheelchair and an individual who must elevate a lower extremity in terms of their respective ability to perform substantial gainful activity."

It is the Secretary's job to evaluate the trustworthiness of a vocational expert's testimony. As we have recently stated, the question of whether a significant number of jobs exists in light of a vocational expert's testimony "should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir.

**2.** Coagulation of the blood is the central process in the pathology of venous thrombosis. R.N. Gray and L.J. Gordy, 1C *Attorney's Textbook of Medicine* § 21A.11, p. 21A–10 (3d ed. 1986). "Changes in conditions of three major risk factors facilitate thrombus formation: (1) the rate of blood flow, (2) the integrity of the wall of the vein, and (3) the chemical and physical constitution of blood." *Id.* at § 21A.12, p. 21A–11; *see also The Merck Manual of Diagnosis and Therapy,* p. 560 *et seq.* (14th ed. 1982). Cigarette smoking has been shown to be a contributing cause of the above changes and to increase the likelihood that one will suffer from circulatory problems such as thrombophlebitis. J. Harkavy, "Cardiovascular Manifestations due to Hypersensitivity," 69 *New York State Journal of Medicine* 2757 (1969); S. Panayotopoulos, *et al.,* "Antigenic Study of Nicotiana Tabacum and Research on Precipitins Against Tobacco Antigens in the Serum of Smokers and Nonsmokers," 2 *Allergologia et Immunopathologia* 111 (1974); R.N. Stillman, *et al.,* "A Ten Year Study of Heparin Therapy for Thrombophlebitis in Ambulatory Patients," 145 *Surgery, Gynecology and Obstetrics* 193 (1977); S. Shionoya, "What is Buerger's Disease?", 7 *World Journal of Surgery* 544 (1983).

1988). It is true that if the vocational expert's testimony does not take into account the medical status of the claimant, or if the expert is unable to testify without qualification about the jobs a claimant can perform, the ALJ may not rely on his opinion. *Id.* at 274; *Graves v. Secretary of Health, Education and Welfare,* 473 F.2d 807 (6th Cir.1973); *Vasquez v. Schweiker,* 701 F.2d 733 (8th Cir.1983). There is, however, no requirement that the vocational expert have direct first-hand knowledge of someone in the claimant's condition performing the jobs he is said to be capable of performing.

In the case at bar the ALJ gave Vocational Expert Simmons an accurate account of the claimant's medical condition. Mr. Simmons testified without qualification about the jobs the claimant was capable of performing. We have no reason to suppose that the ALJ did not carefully weigh the credibility of witnesses who testified, and the ALJ's acceptance of Mr. Simmons' testimony cannot be said to have been improper. The claimant has in effect asked this court to make a *de novo* determination of the vocational expert's credibility. This we may not do. *Myers v. Richardson,* 471 F.2d 1265 (6th Cir.1972).

The judgment of the district court is AFFIRMED.