In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1746

BONNIE SHRAMEK,

Plaintiff-Appellant,

v.

KENNETH S. APFEL, Commissioner
of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98 C 166--John C. Shabaz, Chief Judge.

Argued December 3, 1999--Decided September 1, 2000

Before FLAUM, Chief Judge, ROVNER and EVANS,
Circuit Judges.

ROVNER, Circuit Judge.  Bonnie Shramek applied
for Social Security Disability Insurance Benefits
(DIB) and Supplemental Security Income (SSI). The
focus of her claim for benefits was her history
of frequent superficial phlebitis and repeated
deep venous thrombophlebitis, for which she
received approximately forty treatments over a
fifteen year period. After a hearing, the
Administrative Law Judge (ALJ) denied her claim
for benefits at Step 5 of the sequential process.
In doing so, the ALJ found that: she was not
currently employed (Step 1); she suffered from a
severe impairment (Step 2); her impairment did
not meet or equal the SSA listings (Step 3); she
was not capable of performing her past work (Step
4); and SSA had met its burden of demonstrating
that she was capable of performing work in the
national economy (Step 5). See Knight v. Chater,
55 F.3d 309, 313 (7th Cir. 1995) (explaining the
sequential process). In reaching his conclusions
at Step 5, the ALJ found that she was capable of
doing sedentary work with some restrictions, and
that a sufficient number of such positions
existed in the economy. The Appeals Council and
the district court affirmed that determination,
and she now appeals to this Court.

Shramek raised a number of issues in this Court

as she did in the district court, but unfortunately there is little overlap between the two. Many--if not most--of the issues raised in this appeal were not raised in the district court. Although the failure to assert an argument at the Appeals Council does not operate as a waiver of that claim, Johnson v. Apfel, 189 F.3d 561 (7th Cir. 1999), issues that are not raised before the district court are waived on appeal. Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 537 & n.4 (7th Cir. 1992); Reynolds v. Bowen, 844 F.2d 451, 453 (7th Cir. 1988). A generous reading of the briefs before the district court and this Court yields a few issues that have been preserved, which we will address.

Shramek contends that the ALJ erred in crediting the opinion of the medical examiner, Dr. Eckman, who had reviewed the record but had never examined her, over that of her treating physician, Dr. Quenan, who had ministered to her for over 10 years. Shramek also asserts that the ALJ improperly discredited Shramek's testimony regarding her disability. We agree with most of these arguments, but affirm because they ultimately did not affect the outcome.

I.

We turn first to the ALJ's assessment of Shramek's credibility. A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). Where, however, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," we cannot uphold the ALJ's determination. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996); Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998). In analyzing an ALJ's opinion for such fatal gaps or contradictions, "we give the opinion a commonsensical reading rather than nitpicking at it." Johnson, 189 F.3d at 564.

The ALJ stated that the "claimant testified that she is unable to work due to chronic pain and swelling in her lower extremities that significantly limits her from performing prolonged sitting, walking or standing." He found her testimony regarding her discomfort and limitations "inconsistent with her daily activities and the medical evidence of record, and not fully credible." The ALJ then recited factors that led to that conclusion, which included: no significant flare-ups of the disease since the onset date of December 1981, visits to her treating physician that occurred "only" every

two to five months, and her failure to fully comply with the recommended treatment. Those "factors" identified by the ALJ are each either without support in the record or are patently insufficient to support his conclusion.

For instance, contrary to the ALJ's statement, the record demonstrates numerous hospitalizations and other "flare-ups" since the onset date of the disease. A glance at only a one-year period reveals the following history:

8-16-91: right leg was erythematous/1 and tender, and her left leg showed marked problems with stasis dermatitis/2 and recurrence of smaller varicosities;/3 impression was chronic recurrent superficial phlebitis;

9-26-91: noted recurrent superficial phlebitis of the right lower leg with erythema;

11-11-91: superficial phlebitis of the right lower leg; no open ulcerations but the skin was warm, reddened and there was mild stasis dermatitis with some varicosities;

2-3-92: phlebitis in the right leg with chronic stasis dermatitis and varicosities; area of inflammation in the posterior aspect of the lesser saphenous system just above the ankle; heat and elevation prescribed;

7-10-92: inflammation of the left thigh with obvious phlebitis; prescribed aspirin, hot packs, elevation and antibiotics

Far from refuting her allegations of swelling and discomfort, those medical records provide significant support for it. In fact, the record contains at least 13 separate instances in which elevation is recommended, thus affirming her claims of swelling and clotting. Similarly, the ALJ's belief that she is not credible because she "only" sought physician treatment every 2-5 months is incomprehensible. It is unclear what frequency of visits he would deem sufficient, but physician visits every 2-5 months for fifteen years is hardly insubstantial, and is an unsound basis on which to reject testimony of swelling and discomfort that is consistent with the complaints regularly made to the physician during those visits.

Another reason provided for the ALJ's credibility assessment is her purported failure to comply with the prescribed medical treatment. The alleged non-compliance identified by the ALJ included her failure to quit smoking despite evidence that smoking could worsen the condition. That is a misuse of the non-compliance

regulation. 20 C.F.R. sec. 404.1530(a) provides that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." The failure to do so without good reason will result in a denial of benefits. 20 C.F.R. sec. 404.1530(b). "Essential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work." Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985).

In Rousey, we reversed an ALJ's denial of benefits premised in part on the claimant's failure to quit smoking where the claimant suffered from chronic obstructive pulmonary disease. We held that no evidence demonstrated that she would be restored to a non-severe condition if she quit smoking. Id. We similarly denounced the ALJ's conclusion that her smoking rendered incredible her allegations of pain because no medical evidence linked her chest pain directly to her smoking. Id. at 1070. As in Rousey, the ALJ here made no finding that the prescribed treatment would restore her ability to work, and the record would not in fact support such a finding. In addition, no medical evidence directly linked her pain or swelling to her smoking. Therefore, the ALJ erred in relying on her failure to quit smoking as evidence of non-compliance and as a basis to find her incredible. We note that even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer--directly caused by smoking--who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination.

The record also provides scant support for the other allegations of non-compliance raised. For instance, the ALJ decries Shramek's failure to wear prescribed elastic stockings, stating that she testified that she declined to wear these stockings because it caused too much swelling in her legs. That is not an accurate recitation of her testimony. When asked whether she wears elastic stockings, Shramek responded "I tried them in the hospital, but my legs swelled above it where they had to take it off because it was

cutting off circulation." That is her only testimony on the issue. It indicates that the hospital personnel discontinued the stockings because of the swelling, and does not support even an inference of non-compliance on her part. The remaining allegations of non-compliance are no more convincing.

Finally, the ALJ found Shramek's testimony inconsistent with her daily activities, declaring that her daily activities are "clearly consistent with the ability to perform some work activities." Again, that finding is without basis in the record. Her testimony, as characterized by the ALJ himself, was that she had "chronic pain and swelling in her lower extremities that significantly limits her from performing prolonged sitting, walking or standing." She never testified that she was unable to perform "some work activities," and thus the alleged contradiction is illusory. Moreover, her testimony that she was significantly limited in performing prolonged sitting, standing and walking is not contradicted by her ability to care for the house and her children. Such work by its nature provides the type of flexibility to alternate standing, sitting and walking, and to rest and elevate the legs when necessary, that she, Dr. Quenan, and even Dr. Eckman testified was necessary. It is therefore not a basis to find her incredible. Compare Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) (sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.) Accordingly, the factors used by the ALJ in rejecting Shramek's credibility are not supported by the record.

Shramek also challenges the ALJ's failure to credit the testimony of her treating physician over that of the medical examiner. In his decision, the ALJ expressly adopted the functional capacity assessment of Dr. Eckman limiting her to carrying no more than 20 pounds, walking no further than 3-4 blocks, and sitting and standing no more than 4 hours out of an 8-hour day. The ALJ's determination was erroneous for a number of reasons, not the least of which is it did not accurately reflect the functional capacity assessment actually tendered by Dr. Eckman. In addition to the above limitations, Dr. Eckman opined that she could sit or stand for only 30-45 minutes at a time before she would have to move. The ALJ fails to acknowledge that in his opinion.

That limitation by Dr. Eckman in fact tracks a similar requirement imposed by Dr. Quenan, who maintained that Shramek could not perform any

work requiring prolonged sitting, standing or walking, with prolonged defined as lasting between 30 and 45 minutes. Dr. Quenan also stated that Shramek needed to rest and elevate her legs after 30 minutes of activity. The ALJ erred in rejecting the opinion of Dr. Quenan, who treated her for over 10 years for this condition. A physician's opinion regarding the nature and severity of an impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. 20 C.F.R. sec. 404.1527(d)(2). Nothing in the record contradicted Dr. Quenan's conclusions, and the medical evidence in the record supports his opinion. In fact, Dr. Eckman was asked whether Dr. Quenan's assessment was consistent with the medical treatment notes, and he stated that "I think in general it is." He went on to state that he had some reservations about Dr. Quenan's assessment but was open to agreeing with it if there was any documented deep vein thrombosis. Later in his testimony, he acknowledged that the record in fact contained such evidence of deep vein thrombosis. Although Dr. Eckman thought that Dr. Quenan's diagnostic conclusions could be verified through "some of the more modern testing," the ALJ did not order such testing.

II.

The ALJ thus mischaracterized Dr. Eckman's opinion in his decision, and improperly discounted the testimony of Shramek and the opinion of Dr. Quenan. None of those errors, however, ultimately impacted the outcome. See Sarchet, 78 F.3d at 309 (where fact findings are unreliable because of serious mistakes or omissions, we reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion). At the hearing, the ALJ in fact submitted a hypothetical to the vocational expert (VE) that included all of the functional limitations set forth by Dr. Quenan and was consistent with Shramek's own testimony regarding her limitations. Dr. Quenan's opinion was that Shramek:

is not able to do any work that involves prolonged standing, sitting or walking. "Prolonged" for her is anything from 30 min. to 45 min. She has difficulty at this time in even completing her own housework and has to rest and elevate her legs after only 30 min. of activity. . . . It is my opinion that she would not be able to perform any work that she could not do in a lounge chair with her legs elevated.

In response to that assessment, the ALJ asked the

VE whether sufficient work existed for a claimant with her age, education and work history, who could stand only four out of eight hours and sit four out of eight hours with the option to sit or stand every half hour and with the option to elevate her feet. The VE testified that there would be a number of sedentary employment positions that fall within those parameters. Thus, even accepting the limitations set forth by Shramek and Dr. Quenan, she is not disabled under the statute./4

   The ALJ clouded this issue by mischaracterizing the VE's testimony. In the decision, the ALJ stated that "even accepting Dr. Quenan's report at face value, with the exception of the need to rest and elevate her lower extremities after 30 minutes of activity, the vocational expert testified that the claimant was still capable of performing all of the above cited jobs." If that sentence was accurate, there would indeed be a problem here because the need for regular elevation of her feet is well-documented in the record. The VE's testimony, however, was not so limited. The VE accepted Dr. Quenan's limitations and declared that sufficient work still existed that met those parameters with one caveat. The VE testified that if Shramek would need to rest after every 30 minutes of activity, as opposed to simply elevating her legs, then she would not be capable of working. A plain reading of Dr. Quenan's assessment, however, belies such a limitation. When discussing her ability to complete her housework, he states that she needs to rest and elevate her legs after 30 minutes of activity. That statement does not indicate that she cannot engage in any other activity while she is elevating her legs. The reference to resting clearly refers to taking a break from the housework and getting off her feet. In fact, his later statement that she could perform work if it could be done from a lounge chair with her legs elevated establishes his belief that she could engage in work activity while elevating her legs. Moreover, if his statement were interpreted as imposing a rest break from any work every 30 minutes, the ALJ was justified in disregarding that opinion because it is unsupported by any evidence in the record. Therefore, the ALJ propounded a hypothetical to the VE that included all of the supportable limitations identified by Dr. Quenan, and the VE stated that work existed in the national economy in this region that would fall within those parameters. On that basis, the decision of the ALJ denying benefits because she was capable of performing work in the regional economy was supportable. Shramek did not challenge in the district court the validity of the VE's conclusion and thus waived any such challenge on appeal. Accordingly, the decision of

the district court is affirmed.


/1 Erythema is inflammatory redness of the skin. Stedman's Medical Dictionary, 5th Unabridged Lawyer's Ed. (1982).

/2 Stasis dermatitis is erythema and scaling of the lower extremities due to impaired circulation and other factors. Stedman's Medical Dictionary, 5th Unabridged Lawyer's Ed. (1982).

/3 Varicosity is a varix or varicose condition. Varix is a dilated vein, or an enlarged and torturous vein, artery or lymphatic vessel. Stedman's Medical Dictionary, 5th Unabridged Lawyer's Ed. (1982).

/4 Although the need to elevate her legs was presented to the VE, the hypothetical did not include Dr. Quenan's reference to the lounge chair. Nothing in the record indicates that the elevation had to be achieved in that manner, and she does not argue on appeal that the ALJ erred in failing to include that requirement in the hypothetical to the VE.