Connie R. SEALS, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. CIV.A.01–G–2478–M.

United States District Court, N.D. Alabama, Middle Division.

March 8, 2004.

Darryl W Hunt, Clark & James LLC, Birmingham, AL, for Connie R Seals, plaintiff.

Alice H Martin, U.S. Attorney, Winfield J Sinclair, U.S. Attorney's Office, Birmingham, Mary Ann Sloan, Marilynn Kelm, Social Security Administration–Office of General Counsel, Atlanta, GA, for Jo Anne B Barnhart, Commissioner of Social Security Administration, defendant.

### *MEMORANDUM OPINION*

GUIN, District Judge.

The plaintiff, Connie R. Seals, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Disability Insurance Benefits (DIB). Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth,* at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth,* at 1239.

### STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or

mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir.1993); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir.1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope*, at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir.1995).

▇▇▇ In the instant case, the ALJ, Jack Ostrander, determined the plaintiff met the first two tests, but concluded did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform her past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." *Foote*, at 1559. Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical–Vocational Guidelines (the grids). *Foote*, at 1558–59. The presence of a non-exertional impairment, also prevents exclusive reliance on the grids. *Foote*, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony". *Foote*, at 1559.

## THE PLAINTIFF MEETS LISTING 3.02A

Listing 3.02A requires that a claimant have "[c]hronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E.)." Table I is as follows:

Table I

| Height without shoes (centimeters) | Height without shoes (inches) | $FEV_1$ equal to or less than (L, BTPS) |
|---|---|---|
| 154 or less | 60 or less | 1.05 |
| 155–160 | 61–63 | 1.15 |
| 161–165 | 64–65 | 1.25 |
| 166–170 | 66–67 | 1.35 |
| 171–175 | 68–69 | 1.45 |
| 176–180 | 70–71 | 1.55 |
| 181 or more | 75 or more | 1.65 |

The Social Security Administration referred the plaintiff to Dr. John L. Buckingham for a consultative examination on June 22, 1998. Dr. Buckingham conducted pulmonary function tests and his report contains six spirometer tracings—three before, and three after broncho dilation. The highest $FEV_1$ recorded was 1.01. [R 195] Doctor Buckingham stated in his report that he believed the testing to be valid. [R 194] These results, if credited, satisfy the listing regardless of the plaintiff's height. Even though its own consultant stated in the report that he believed the results to be valid, the Social Security

Administration referred the plaintiff for further testing.[1]

Additional pulmonary function testing was performed under the direction of Dr. Bruce M. Pava, M.D. at the request of the Social Security Administration. The test report shows the plaintiff's height as 64 inches.[2] Based upon the Listing table, the plaintiff is disabled if her best $FEV_1$ was equal to or less than 1.25. The test report shows the plaintiff's $FEV_1$ as 1.2 prior to administration of a bronchodilator, and 1.3 after broncho dilation. [R 251] It is inexplicable to the court why the Social Security Administration would order a second consultative pulmonary test with the test values reported only to one decimal place, when the Listing table requires that $FEV_1$ be known to two decimal places.[3] The spirometer tracings from which the reported numbers were derived is ruled with horizontal lines in increments of 0.05 liters, and it would seem proper to round to the nearest of line, meaning the results would logically be reported to two decimal places. Nevertheless, the court has no difficulty under the circumstances of this case finding that a reported value of 1.3 meets the requirements of Listing 3.02A.[4] A true $FEV_1$ of 1.25, accurate to two decimal places, would be rounded up to 1.3. In other words, if all that is known is that the $FEV_1$ rounded to one decimal place is 1.3, a conclusion that the true reading rounded to two decimal places is higher than 1.25 would not be supported by substantial evidence. There is no rational reason to assume a true $FEV_1$ of 1.26 or above, based

1. There is a case reviewer's note in the record requesting additional pulmonary function testing, apparently because Dr. Buckingham's results were believed to be inconsistent and were performed while the plaintiff was wheezing. [R 250] However, the court notes that Dr. Buckingham believed the results to be valid, and the Listing allows testing when wheezing is present. "Wheezing is common in asthma, chronic bronchitis, or chronic obstructive pulmonary disease and does not preclude testing." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00E.

2. Other medical records record the plaintiff's height as 62 inches. It is certain that the plaintiff did not grow two inches at age 42. Only two rational explanations come to mind. Either the records showing plaintiff's height as 62 inches were based upon her own inaccurate estimation, or the measurements were incorrect, perhaps due to poor posture. Because of the importance of the plaintiff's height to a determination of whether she meets Listing 302A, Dr. Pava's report contains a checklist indicating the plaintiff was measured standing without shoes, as is required by the Listing. [R 252] None of the other reports contain such a notation. The court, therefore, concludes that for the purposes of whether the plaintiff meets Listing 3.02A, the plaintiff's height is 64 inches as found by Dr. Pava.

3. The Listing table values which provide the upper limits for each height range all have five as the last digit and are given to two decimal places. This means that if a claimant's true $FEV_1$ exactly equals the Listing value, but his test result is rounded to one decimal place, a deserving claimant will be denied benefits based upon the convention of rounding up. Metaphorically, Listing 3.02A provides that a glass half-full of water for each of the height ranges satisfies the listing. Rounding the test results to one decimal place means that Commissioner will always view that half-full glass as full, thereby denying a claimant who meets the Listing benefits. The court hopes this is not the reason Dr. Pava's results are rounded to only one decimal place.

If the reason the test report was rounded to one decimal place was that it was deemed to be accurate only to one decimal place, such testing would be useless in determining whether or not the plaintiff met Listing 3.02A in close cases such as this.

4. These include the prior testing by Dr. Buckingham showing an $FEV_1$ of 1.01 and the fact that it was the Social Security Administration that ordered both tests. Also, PFT testing performed by the plaintiff's treating physicians strongly supports a true $FEV_1$ below 1.25. [R 385, 394]

solely on a report showing an $FEV_1$ of 1.3. If a person's $FEV_1$ were random, a gambler might bet that the true $FEV_1$ when rounded to two decimal places was 1.26 or higher because of the higher probability of such a result. However, the plaintiff's $FEV_1$ is not a random number, but rather a measurement of her actual pulmonary functioning. The Commissioner is not allowed to "play the odds" in determining whether a claimant is disabled.

Additional support for finding that the plaintiff's $FEV_1$ was equal to or less than 1.25 when tested by Dr. Pava is found from a review of the post bronchodilator test tracings. [R 254] $FEV_1$ is the one second forced expiratory volume. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00E. The following provides a more detailed explanation of how $FEV_1$ is measured:

Each line in the picture section (Figure 1b) is called a tracing, which represents each of the patient's four exhalations on the graph. This is a time/volume graph, which plots time across the bottom or x-axis (the length of the tracing) and volume on the side or y-axis (the height of the tracing).

Time is charted in one-second intervals, represented by each vertical line. Zero is at the lower left corner, and the seconds count off as the tracing moves toward the right side of the graph. The point at which the tracing crosses the vertical line representing one second is the FEV1 reading. Now follow that point to the left to find the volume for the FEV1 reading. (See the inset in Figure 1b for a highlighted FEV1 measurement.)

http://www.rnweb.com/be_co re/content/journals/r/data/2003/0601/gskspiro2.html (viewed February 9, 2004). A review of the post bronchodilator tracings shows that none of the tracings exceeds 1.25 as it intersects the one second vertical line. [R 254] The highest tracing appears to just reach the bottom edge of the 1.25 line as it intersects the one second vertical line. Therefore, the tracings show that the plaintiff's $FEV_1$ was less than or equal to 1.25. This satisfies Listing 3.02A.

■ The Commissioner twice had the plaintiff's pulmonary functioning tested. The testing by Dr. Buckingham clearly shows she meets the Listing. The ALJ did not discuss the $FEV_1$ values reported by Dr. Buckingham and gave no reason for rejecting them. His consideration of Dr. Buckingham's report concludes as follows:

"Pulmonary function testing was consistent with asthmatic bronchitis, probably secondary to smoking." [R 23] The ALJ did not even mention the results of those tests, in which the best reported $FEV_1$ was 1.01. The testing by Dr. Pava does not provide substantial evidence for ignoring Dr. Buckingham's results, and if fairly considered, compels a finding that the plaintiff meets Listing 3.02A. The ALJ had the opportunity to elicit additional medical evidence to clarify the testing done by Dr. Pava, but chose not to do so. *See Jenkins v. Sullivan,* 906 F.2d 107, 109 (4th Cir.1990)(noting the ALJ improperly analyzed the medical evidence himself rather than eliciting additional medical testimony from physicians). Therefore, the medical evidence of record establishes the plaintiff meets Listing 3.02A, and the ALJ's finding to the contrary is not supported by substantial evidence.

## THE ALJ'S DISCUSSION OF PLAINTIFF'S FAILURE TO FOLLOW PRESCRIBED TREATMENT

The ALJ addressed the plaintiff's failure to stop smoking cigarettes several times in his decision. While he did not find the plaintiff met Listing 3.02A, the ALJ stated as follows:

Although the claimant's pulmonary impairment is close to meeting the criteria of a listing, the medical evidence of record also reveals that her cigarette abuse aggravates her asthmatic condition and she has not followed her treating doctor's instructions to quit smoking (Exhibits 18F—20F). It is also noted that four people currently live and smoke in claimant's home (Exhibit 20F).

It also appears that the claimant's residual functional capacity should improve if she quits smoking and does not permit smoking in her house. After a recent week in the hospital without cigarettes and placed on round the clock nebulizer

treatments, she was released in satisfactory condition (Exhibit 13F).

[R 25] The ALJ also refused to credit the plaintiff's subjective complaints:

The limitations claimed by the claimant are not supported by the medical evidence of record. The objective medical evidence does not reveal any significant findings to justify the breathing problems, level of fatigue, and limitations alleged by the claimant. Therefore, the claimant's statements concerning her impairments and their impact on her ability to work cannot be fully credited. The medical evidence of record reveals that the claimant has moderate to severe asthma with acute exacerbations of her asthma due to continued cigarette abuse (Exhibits 4F, 5F, 6F, 9F, 13 F, 18F – 20F). The evidence of record also reflects that the claimants condition has improved when she has stopped smoking and received maximum treatment (Exhibits 13F and 18F). However, the claimant has continued to smoke and be exposed to secondhand smoking (Exhibit 20F, pg. 5). despite numerous warnings from doctors over the last two years to stop smoking. The Social Security Regulations (20 CFR §§ 404.1530 and 416.930) provides [sic] that in order to be found disabled and get benefits, an individual *must* [emphasis in original] follow treatment prescribed by her physician, but the evidence of record reflects that the claimant is not following prescribed treatment to quit smoking (Exhibit 20F, pg. 1).

[R 26–27] In refusing to credit the statement of one of the plaintiff's treating physicians, the ALJ stated as follows:

The Administrative Law Judge has considered and given some weight to the medical opinion of Dr. Vines, a treating source. Although Dr. Vines treatment records reveal that the claimant has se-

vere asthma which is close to meeting the listing level, his records also reveal that he has repeatedly instructed the claimant to quit smoking because it aggravates her asthmatic condition (Exhibits (18F—20F)).

[R 28]

Because of the ALJ's extensive discussion of the plaintiff's smoking; his citation to the regulation concerning failure to follow prescribed treatment; his extensive discussion of the plaintiff's smoking in his refusal to credit both the plaintiff's subjective testimony and that of her treating physician; it is clear that the plaintiff's failure to stop smoking was central to the ALJ's finding that she was not disabled.

## THE IMPLICATIONS OF CONTINUED SMOKING

This court has previously held that "continuing to smoke despite a physician's warning as to consequences indicates that a claimant has made a conscious lifestyle choice which is inconsistent with a finding of disability." *Wilda Elliot v. Apfel,* CV No. 98–G–0820–NE (Memorandum Opinion, entered November 18, 1998)(citing *Sias v. Secretary of Health and Human Services,* 861 F.2d 475, 480 (6th Cir.1988)). The court has come to realize that the above quoted language is not correct as a general statement of the law.

In *Sias,* the Sixth Circuit Court of Appeals concluded that substantial evidence supported the ALJ's refusal to credit the plaintiff's subjective testimony. The plaintiff's continued smoking was only one of several factors noted by the court:

The claimant's style of life is not consistent with that of a person who suffers from intractable pain or who believes his condition could develop into a "very quick life-threatening situation." The claimant admitted to the ALJ that he was at least 40 pounds overweight; ignoring the instructions of his physician, he has not lost weight. He claims he has not worn the support hose his physician prescribed to alleviate swelling because support hose would cost too much—yet the claimant admits that against the advice of his doctor he smokes two packs of cigarettes a day. Taking judicial notice of the monetary cost of this dangerous habit, we calculate that the cost of the hose could have been covered by the savings the claimant would realize if he gave up cigarettes.

As to the health cost of a two-pack-a-day habit, the claimant argues that "there is no medical evidence in the record establishing a relationship between the plaintiff's impairment and cigarette smoking." Again, however, we can take judicial notice of the massive body of medical opinion supporting the advice the claimant received from his doctor on the subject of cigarette smoking.

*Sias,* at 480. It is clear that more than the mere continuance of smoking was considered by the court. The court concluded its discussion of the plaintiff's credibility with the following:

The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege—but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Id.* This eloquent support of the principle of individual responsibility was drawn on by this court in *Elliot* in it's holding quoted above. In doing so, this court failed to head the warning of Chief Justice Marshal issued almost two centuries ago: "It is a

maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 399, 5 L.Ed. 257, 290 (1821). In *Sias,* and *Elliot,* continuing to smoke may have been inconsistent with a finding of disability. However, this court's holding in *Elliot* does not serve well as a general rule for use in deciding other cases and the court does not consider it an accurate statement of the law.

 A more enlightened view concerning the impact of continued smoking has emerged in the Seventh Circuit. In *Shramek v. Apfel,* 226 F.3d 809 (7th Cir. 2000), the court considered whether the plaintiff's continued smoking constituted a failure to comply with prescribed medical treatment.[5] In *Shramek,* the court began by noting that in order for the Commissioner to deny benefits for failure to follow prescribed treatment, she must find "that if the claimant followed her prescribed treatment she could return to work." *Id.* at 812 (quoting *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985), *accord Patterson v. Bowen,* 799 F.2d 1455, 1460 (11th Cir.1986))("[T]he ALJ must find that if the claimant followed the prescribed treatment, his ability to work would be restored, and this finding must be supported by substantial evidence."). The Seventh Circuit reviewed its prior holding in *Rousey:*

> In *Rousey,* we reversed an ALJ's denial of benefits premised in part on the claimant's failure to quit smoking where the claimant suffered from chronic obstructive pulmonary disease. We held that no evidence demonstrated that she would be restored to a non-severe condition if she quit smoking. *Id.* We similarly denounced the ALJ's conclusion that her smoking rendered incredible her allegations of pain because no medical evidence linked her chest pain directly to her smoking. *Id.* at 1070. As in Rousey, the ALJ here made no finding that the prescribed treatment would restore her ability to work, and the record would not in fact support such a finding. In addition, no medical evidence directly linked her pain or swelling to her smoking. Therefore, the ALJ erred in relying on her failure to quit smoking as

---

**5.** The pertinent regulation is 20 C.F.R. § 404.1530, which provides as follows:

(a) *What treatment you must follow.* In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. (b) *When you do not follow prescribed treatment.* If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits. (c) *Acceptable reasons for failure to follow prescribed treatment.* We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
(4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
(5) The treatment involves amputation of an extremity, or a major part of an extremity.
(Italics in original).

evidence of noncompliance and as a basis to find her incredible.

In addition, the court recognized that due to the addictive nature of cigarettes, failing to stop smoking would not necessarily support a finding that the plaintiff's testimony was not credible even if a link between smoking and her symptoms was shown:

> We note that even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies·that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer-directly caused by smoking-who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination.

*Shramek,* at 813. In the future, the court will apply the reasoning of *Shramek* and *Rousey* to cases involving continued smoking against the advice of a doctor and will not find that such activity *per se* disqualifies a claimant for disability benefits.

### APPLICATION OF THESE RULES TO THE PRESENT CASE

■ The first step in a case involving an alleged failure to follow prescribed treatment is determining whether a prescribed course of treatment is actually involved. Sometime this will be readily apparent. Other cases will not be so clear. Guidance in smoking cases can be found in cased involving recommendations to lose weight. In *McCall v. Bowen,* 846 F.2d 1317, 1319 (11th Cir.1988), the court explained: "A physician's recommendation to lose weight does not necessarily constitute a prescribed course of treatment ...." Every recommendation by a physician does not constitute a prescribed course of treatment.

It is also important to note that the standard requires that the failure to follow treatment is without good reason. *McCall* at 1319 ("[The Commissioner] may deny SSI disability benefits only when a claimant, without good reason, fails to follow a prescribed course of treatment that could restore her ability to work.")

■■ Even if it is assumed in the present case that the plaintiff's doctors instructions to stop smoking constituted a prescribed course of treatment, the plaintiff's failure to stop smoking does not necessarily constitute a refusal to follow that prescribed treatment. A willful refusal to follow treatment may not be assumed from a mere failure to accomplish the recommended change. In *McCall,* the court was considering an obese claimant whose doctors had recommended weight loss. The court held that "a claimant's failure to accomplish the recommended change [does not] constitute a refusal to undertake such treatment." *McCall* at 1319. The court further noted that the claimant's "obesity, of itself, does not justify the conclusion that she has refused treatment ...." These standards seem equally applicable to the present case. Mere failure to stop smoking, like a failure to lose weight, does not constitute a refusal to under take a prescribed course of treatment.

■ The record, in fact shows the plaintiff did try to stop smoking. The medical records contain notations that she was trying to quit. [R 284, 209] She also seems to have had limited success at times. A discharge note from her hospitalization in October 1996 states that "[s]he has been a nonsmoker for the past 2 years but has prior use." [R 169] A treatment note of

September 23, 1998, states that the plaintiff is gaining weight after stopping smoking one month previously. [R 382] A treatment note states that she was "trying to work on the cigarettes," which she had gotten down to one pack every two days. [R 209] Zyban was prescribed. [R 209] A treatment note from August 1998 states that she is trying to quit. [R 284] This treatment note also states that on exam she was tachypneic, dyspneic and was not able to speak in complete sentences, and she was admitted to the hospital. [R 284] She was noted to be taking Zyban in August 1998. [R 281] A January 29, 1998, treatment note states the plaintiff had started smoking again because of nerves. [R 215] It states that she "[s]aid she was just too nervous to stay off her cigarettes when she ran out of the Ativan [an antianxiety agent] and also out of her Prozac." [R 215] Her prescriptions were refilled and she was told she could take an extra Ativan once in a while in the hope that it would allow her to stop smoking. [R 214] This shows that the plaintiff's doctor believed she was trying to stop smoking. It also shows that he believed she needed the assistance of antianxiety medication to try to achieve that goal. The above shows the record does not contain substantial evidence to support a finding that the plaintiff did not try to stop smoking in the present case.

A treatment note of May 12, 1999, contains the following: "We have had a long discussion regarding the irrational decision to continue to smoke despite her severe asthma symptoms." [R 409] Continuing to smoke, however, is often not a voluntary decision, rational or otherwise, of the smoker. On the plaintiff's August 1998 Hospital discharge summary is found the following diagnosis: "Nicotine addiction." [R 279] Breaking an addiction is not a simple matter of rationally deciding to cease the addictive behavior, whether it be smoking, drinking or drug abuse. The world would obviously be a better place if that were so. In the case of nicotine addiction, a mere failure to successfully stop smoking will not support a finding of willful refusal to try. If the plaintiff was unable to stop smoking because she was addicted to nicotine, her noncompliance would not be unjustified. The burden is on the Commissioner to produce evidence of unjustified noncompliance. *Dawkins v. Bowen*, 848 F.2d 1211, 1214, n. 8 (11th Cir.1988). In the present case, the ALJ made no finding that the plaintiff was actually able, mentally and physically, to stop smoking. Nor did the Commissioner cite to any evidence, other than the plaintiff's failure to stop smoking, to show that her noncompliance was unjustified.

The ALJ also failed to make another finding essential to a denial of benefits for failure to follow prescribed treatment. The ALJ must find that following the prescribed treatment would restore the claimant's ability to work:

> In order to deny benefits under § 404.1530, the ALJ must find that if the claimant followed the prescribed treatment, his ability to work would be restored, and this finding must be supported by substantial evidence.

*Patterson v. Bowen*, 799 F.2d 1455, 1460 (11th Cir.1986)(emphasis added). If the ALJ fails to make this finding, or if his finding is not supported by substantial evidence, a claimant may not be denied benefits for failing to follow the prescribed treatment. In the present case, the ALJ did not make a finding that if the plaintiff stopped smoking, she would be able to work. The ALJ did find the plaintiff would improve if she stopped smoking:

> It also appears that the claimant's residual functional capacity should improve if she quits smoking and does not permit smoking in her house. After a recent week in the hospital without cigarettes

and placed on round the clock nebulizer treatments, she was released in satisfactory condition (Exhibit 13F).

\*　　\*　　\*　　\*　　\*　　\*

The evidence of record also reflects that the claimants condition has improved when she has stopped smoking and received maximum treatment (Exhibits 13F and 18F).

[R 25–27] Improvement does not equal an ability to work. Did the ALJ really believe that improvement while in hospital undergoing around the clock nebulizer treatments showed the plaintiff could work if she stopped smoking? The record, in fact, overwhelmingly shows that the plaintiff is gravely ill. Her multiple hospitalizations demonstrate this beyond question. In short, there is no doubt the plaintiff would improve if she stopped smoking. But, there is not substantial evidence to support a finding that she would improve to the point of allowing work.

Therefore, when the proper legal standards concerning refusal to follow prescribe treatment are applied to the present case, it is clear that substantial evidence would not support a denial of benefits on that ground. The ALJ did not make the requisite finding that the plaintiff would be able to return to work and such a finding would not be supported by substantial evidence. His finding of willful noncompliance is based solely on her failure to stop smoking and the ALJ did not properly consider evidence showing the plaintiff did try to stop smoking.

## CONCLUSION

The plaintiff meets Listing 3.02A, and the ALJ's finding to the contrary is not supported by substantial evidence. The record will not support a finding that the plaintiff willfully refused to follow prescribed treatment that would restore her ability to work. Therefore, she is disabled within the meaning of the Social Security Act. An appropriate order will be entered contemporaneously herewith.

## FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration is hereby REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed. It is

FURTHER ORDERED that the Commissioner withhold from payments that are determined to be due the plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.

It is further ORDERED pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*