**Guy B. YOUNG, Plaintiff–Appellant,**

v.

**Kenneth S. APFEL, Defendant–Appellee.**

No. 01–3041.

United States Court of Appeals, Sixth Circuit.

July 8, 2002.

Before SILER and DAUGHTREY, Circuit Judges; MARBLEY, District Judge.*

* The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1. At the time of this dispute, Young was 48 years old. He completed high school and received a B.A. in paralegal education from Dyke College in 1979. In 1974 and 1975, Young served in the United States Army be-

## OPINION

ALGENON L. MARBLEY, District Judge.

Plaintiff–Appellant appeals a district court decision affirming the Commissioner of Social Security's denial of his application for disability insurance benefits under the Social Security Act, 42 U.S.C. § 423. The district court had original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). This Court has appellate jurisdiction over the district court's final judgment, pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. For the following reasons, the Court **AFFIRMS** the denial of benefits.

## I. BACKGROUND

Plaintiff–Appellant, Guy B. Young ("Young"),[1] filed the first of two applications for disability insurance benefits ("DIB") on April 16, 1982, based upon his chronic schizophrenia. This claim was granted and Young received DIB through April 1991. Effective August 1, 1991, the Social Security Administration ("the Agency") terminated his benefits because he had been engaged in substantial gainful activity since May 1991 as a pizza deliverer. Young did not challenge this termination, but filed his second application for DIB on December 22, 1993, alleging disability since September 1991 based upon a "nervous condition." Young's second application was denied initially and upon re-

fore being discharged for a psychotic episode. He receives benefits from the Veterans Administration for a seventy-percent service-connected disability. Young worked previously as a cleaner, printer's apprentice, and drill press operator in the late 1980s, and as a pizza deliverer in the 1990s.

consideration. On September 5, 1994, he filed a request for a de novo hearing before an administrative law judge ("ALJ"). Represented by his attorney, Kirk Roose ("Roose"), Young appeared before ALJ Patrick J. Lazzaro on March 12, 1996. On April 23, 1996, ALJ Lazzaro again denied the application because he found that Young had been engaged in substantial gainful activity. The ALJ's decision became the Social Security Commissioner's ("Commissioner") final decision when the Agency's Appeals Council denied review. Young pursued judicial review in the district court, which reversed and remanded the Commissioner's decision, based upon a finding that there was not substantial evidence to support ALJ Lazzaro's determination that Young was engaged in substantial gainful activity. On September 29, 1998, the Appeals Council remanded Young's case to an ALJ for further proceedings consistent with the district court's decision.

On February 3, 1999, a second hearing was held at which Young, again represented by Roose, appeared and testified before ALJ Robert H. Isbell. At the hearing, psychiatrist Daniel Schweid, M.D. ("Schweid") testified as a medical expert, and Mark Anderson, M.S. ("Anderson") testified as a vocational expert. Each also submitted written reports. On April 9, 1999, ALJ Isbell ruled that Young was not disabled and could not collect DIB. Specifically, ALJ Isbell determined that, although Young could not perform his past relevant work, there were a significant number of jobs available in the national economy that he could perform. The ALJ's decision became the Commissioner's final decision when the Appeals Council declined to assume jurisdiction of the case.

On September 8, 1999, Young sought judicial review pursuant to 42 U.S.C. § 405(g). On November 30, 2000, the district court adopted the magistrate judge's report and recommendation, and affirmed the Commissioner's final decision denying Young benefits. Young's appeal, which was timely filed on January 8, 2001, raises two issues for our consideration: whether substantial evidence supports the ALJ's finding that a significant number of jobs in the national economy existed that Young could perform, and whether the ALJ erred by terminating Young's cross-examination of the vocational expert prematurely.

## II. STANDARD OF REVIEW

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *See* 42 U.S.C. § 405(g) ("the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *Preslar v. Secretary of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, this Court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984). An ALJ's decision is not subject to reversal simply because there is substantial evidence that would support the opposite conclusion than that reached by the ALJ. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997).

## III. ANALYSIS

### A. Was The ALJ's Decision Supported By Substantial Evidence?

Under the Social Security Act ("the Act"), 42 U.S.C. § 423(a), an individual is

entitled to disability insurance benefit payments if he (1) is insured for disability insurance benefits; (2) has not attained retirement age; (3) has filed an application for disability insurance benefits; and (4) is under a disability. Since no one disputes Young's eligibility under the first three criteria, the first issue on appeal is whether the ALJ had substantial evidence to support his determination that Young was not "under a disability." The Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1)(A). Furthermore:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in 20 C.F.R. § 404.1520, which provides:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); Walters v. Commissioner of Social Security, 127 F.3d 525, 529 (6th Cir.1997).

In this case, ALJ Isbell, at Step One, determined that Young had not engaged in substantial activity since September 1, 1991. At Step Two, the ALJ determined that Young suffered from chronic schizophrenia and coronary artery disease, both of which are severe impairments. At Step Three, the ALJ determined that Young did not have an impairment or combination of impairments that met a listed impairment. At Step Four, the ALJ determined that Young's impairment prevented him from performing his past work. The matter sub judice, therefore, involves the ALJ's decision at Step Five.

Young argues that, at Step Five, the Commissioner failed to carry his burden of production of evidence that jobs existed that Young could perform, given his residual functional capacity and vocational characteristics. Young contends that the ALJ accepted Schweid's testimony as fully persuasive, including the doctor's opinion that Young should be limited to "piece work" based upon his heart condition. Yet, Young claims that Anderson did not identify any piece work that Young could perform.

The Commissioner argues that the ALJ reasonably relied on the testimony of the medical and vocational experts. The Commissioner claims that Schweid did not limit Young to piece work and that Anderson did identify jobs consistent with Schweid's medical restrictions. Based upon their testimony, the ALJ had substantial evidence to support a finding that Young was not disabled, according to the Commissioner.

The record indicates that substantial evidence existed to support ALJ Isbell's decision that Young was not disabled. At the February 3, 1999 hearing, Schweid examined Young's medical history for ALJ Isbell and submitted a written report on his findings. Young was hospitalized for schizophrenia from October 8, 1981 until January 21, 1982, and from February 16, 1989 until June 16, 1989. During his second hospitalization, Young began treatment with the anti-psychotic medication clozapine, and responded well. Young required no further hospitalization or significant mental health treatment thereafter. In September 1994, Young was diagnosed with myocardial infarction, and underwent successful coronary artery bypass surgery on October 7, 1994.

Based upon this medical history, Schweid concluded that Young had the ability to perform work that was routine, low-stress, and non-confrontational. Schweid stated in his report that such work could not involve high production quotas, intense personal interactions, or supervision of others. Furthermore, Schweid found that Young could engage in light exertional activity that required frequent lifting of ten pounds and occasional lifting of twenty pounds. Schweid limited Young's work to the light exertional level due to his heart condition, but explained that, while Young was constricted by his mental disability, he was able to function with treatment and support. As he had difficulty adapting to changes, though, Young required work of a routine nature.

Anderson also testified as a vocational expert at the hearing before ALJ Isbell and submitted a report on his findings. Anderson classified Young's past work as a part-time pizza deliverer as unskilled and at the medium exertional level. The ALJ questioned Anderson about a hypothetical person, of Young's age, education, and experience, who was limited to light exertional level work that was routine, low stress, and devoid of confrontations, intense personal interactions, high production quotas, and supervisory responsibilities. Anderson identified 805,000 jobs available in the national economy that an individual such as Young could perform. Specifically, he stated that there were 175,000 electrical accessories assembly jobs, 350,000 bench assembly jobs, and 280,000 hand packing jobs that would suit Young. Each of these vocations also included thousands of jobs in Young's northeast Ohio area.

When cross-examined by Young's attorney, Kirk Roose, Anderson explained that these vocations did not involve high production quotas. Anderson stated, "if you look up under the temperament S [in the Dictionary of Occupational Titles], the high production quotas would bring that designation as S and none of these jobs have that as a temperament." The expert acknowledged, however, that only 2.15% of American occupations are classified "S temperament." Young's attorney voiced concern that Anderson and Schweid were operating under different assumptions about what constituted employment with high production quotas.

When the ALJ asked him to "clear it up," Schweid elaborated on his concept of work that Young could perform, which was low-stress and did not involve high production quotas:

What I had in mind was where, more on, more like piece work as opposed to a production line. I think for example, you know, he worked in a let's say a fast food place. If you're there having to crank out the hamburgers and put them up front, that's one thing, but if you're just there doing some, some other task, that might not be a high quota. [Young] actually said something that was interesting. He said he couldn't get the stuff delivered fast enough, the pizzas, they didn't like it. I have no reason to disbelieve that. That may actually be true. That may be why he lost that job. Depends on, you know, if you're a pizza delivery person you would have to go out once an hour and deliver something around the block, but if you had to deliver 10 pizzas in half an hour, you might be under stress, so I, I'm thinking more in terms of the former than the latter. Now, I, when I say once an hour that's, that's just a way of speaking. There are situations, I know, that where individuals are asked, they're paid in accordance with how much they actually do, but the requirement is very, the range that they're allowed in an eight hour day is wide. I mean, they're paid in terms of piece work. Some of the rehab programs work that way, I know that. But I, what I don't know is whether there are a whole lot of competitive jobs like that. That, that's something I don't understand.

. . .

I'm not thinking, I'm not thinking about assembly lines at all. I'm not thinking about anything where a person is, is under the gun in terms of time.

. . .

That's what I meant by no high production quotas. I could have said low production quotas, but there, you've got a similar problem definition. No stressful production quotas might have been a better way of putting it.

Schweid added that Young was not a candidate for production line work "unless the vocational expert finds a production line where there's no stress." Anderson then clarified that the electrical accessories assembly, bench assembly, and hand packing jobs that he mentioned "are all done at a bench" and do not involve assembly lines.

The ALJ asked, "Mr. Anderson, tell us about piece work, isn't that mainly how you get paid or, or do they get limits, normally in the work place?" Anderson responded:

Typically, how they do piece work, and this is with commensurate wage, is they will set the piece work based in what the commensurate rate is and so that the person is paid, for instance if it's a $10 an hour job it's, you know, brought in somewhere that the piece work will be based around what the commensurate rate is. Some do synthetic time studies to see what, you know, what a—with the NTN it's synthetic norms in terms of what should an individual with no impairments be able to do. That becomes the time study and then they're paid according to, you know, the amount they produce.

. . .

At this point I think I'm seeing more and more people going to is just paying minimum wage because it becomes an administrative problem to keep track of pieces and counts and so that, you know, generally I think employers just go to minimum wage now as opposed to paying piece rate.

Young's attorney then questioned, "Do we have any way of knowing how many of these jobs that you enumerated do have a minimum production requirement that he'd be terminated if he didn't make."

Anderson answered, "I don't have way [sic]."

Plaintiff–Appellant's argument that Schweid limited Young strictly to "piece work" is misleading. The context of the testimony makes clear that Schweid was only concerned that Young not be forced to engage in assembly line work involving high production quotas. As he stated, "[w]hat I had in mind was ... *more like piece work as opposed to a production line.*" Thus, any work that was not on a production line, but was routine, low stress, and devoid of confrontations, intense personal interactions, high production quotas, and supervisory responsibilities, would satisfy Schweid's medical restrictions for Young. Anderson indicated that electrical accessories assembly, bench assembly, and hand packing jobs met these limitations and would be suitable for Young.

To be sure, "if the vocational expert's testimony does not take into account the medical status of the claimant, or if the expert is unable to testify without qualification about the jobs a claimant can perform, the ALJ may not rely on his opinion." *Sias v. Secretary of Health and Human Servs.*, 861 F.2d 475, 481 (6th Cir.1988) (citations omitted). As this Court stated in *Sias,* there is "no reason to suppose that the ALJ did not carefully weigh the credibility of witnesses who testified, and the ALJ's acceptance of [Anderson's] testimony cannot be said to have been improper." *Id.* Young essentially requests that this Court "make a de novo determination of the vocational expert's credibility. This we may not do." *Id.* ALJ Isbell considered the entire record and relied properly on the testimony and written reports of qualified medical and vocational experts. In short, the record contains substantial evidence to support

the ALJ's determination, at Step Five, that Young was not disabled.

We, therefore, **AFFIRM** the district court on this first issue.

### B. Whether The ALJ Erred By Terminating Young's Cross–Examination

■ Alternatively, Plaintiff–Appellant argues that the ALJ terminated his attorney's cross-examination of the vocational expert prematurely. Young claims that, had he been given additional time, Roose would have elicited testimony that the jobs Anderson found suitable were not piece work. Young also contends that Roose would have explored the distinction between bench work and assembly line work.

The Commissioner asserts that Young's argument is speculative. As Young has changed attorneys since the hearing, the Commissioner claims that there is no way of knowing what Roose would have asked if given additional time. The Commissioner notes that Roose did not object when the ALJ ceased this line of questioning. Furthermore, the Commissioner maintains that Young had ample opportunity to cross-examine the expert witnesses and, in fact, did so.

As this Court has stated, "[d]ue process requires that a social security hearing be 'full and fair.'" *Flatford v. Chater,* 93 F.3d 1296, 1305 (6th Cir.1996) (quoting *Perales,* 402 U.S. at 401–02). A close reading of the record does not suggest that ALJ Isbell terminated Roose's cross-examination of Anderson improperly or that Young was denied a full and fair hearing. The portion of the record in dispute reads as follows:

ATTY (Roose): Do we have any way of knowing how many of these jobs that you enumerated do have a minimum production requirement that he'd be terminated if he didn't make.

**164**

VE (Anderson): I don't have way.

ALJ (Isbell): That's the last question I'm going to take from you on quotas, production, piece rate or anything else. Do you have any other questions?

ATTY (Roose): Outside of the (INAUDIBLE)?

ALJ (Isbell): Yes.

ATTY (Roose): No. Thank you, Your Honor.

Based upon the transcript, it is not evident that Roose wished to ask Anderson anything further about piece work or the differences between bench work and assembly line work. Young's assertion that his former attorney "was about to deliver the coup de grâce" is mere speculation and strains the credulity of this Court.

The *Flatford* court held that "due process does not require the Commissioner to allow a social security claimant upon request to cross-examine every physician providing post-hearing evidence in order for the hearing to be 'full and fair.'" *Flatford*, 93 F.3d at 1305. In this case, Roose was allowed to cross-examine both Schweid and Anderson, and he did so quite extensively. There is no reason to believe that the ALJ's decision would have changed had this line of questioning continued. Indeed, there is no reason to believe that this lost moment undermined Young's right to a fair hearing. Here, as in *Flatford*, "the record does not show that the administrative law judge abandoned his role as an impartial decisionmaker or failed in his duty to aid the claimant in a full development of the record." *Id.* at 1307.

Thus, we **AFFIRM** the district court as to this issue.

## IV. CONCLUSION

The administrative record contains substantial evidence to support the Commissioner's conclusion that Young was not disabled within the meaning of the Social Security Act. That there may be evidence in the record to support another conclusion is irrelevant. The judgment of the district court is **AFFIRMED**.