# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3577

_____

| | | |
|---|---|---|
| Jeff Blakeman, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Michael J. Astrue, Commissioner of | * | |
| Social Security, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: April 4, 2007
Filed: December 10, 2007

_____

Before LOKEN, Chief Judge, BEAM and BYE, Circuit Judges.

_____

LOKEN, Chief Judge.

Forty-seven-year-old Jeff Blakeman applied for Social Security disability benefits in July 2003, claiming a disability onset date of October 1, 1997. He suffers from a genetic heart condition that allegedly causes disabling fatigue, dizziness, shortness of breath, and arrhythmia. The administrative law judge (ALJ) held a hearing on December 13, 2004, and found Blakeman not disabled. The Appeals Council denied review. Blakeman filed this action for judicial review. The district

court[1] upheld the final agency decision.  Blakeman appeals raising a single issue -- whether substantial evidence on the administrative record as a whole supports the ALJ's finding that Blakeman's subjective complaints of disabling fatigue due to his heart condition are not entirely credible.

Fatigue is one of the subjective symptoms that must be considered when, as in this case, it is cited by a claimant as a cause of his disability and a medically determinable impairment "could reasonably be expected to produce" that symptom. 20 C.F.R. §§ 404.1529(b), 416.929(b).  Our decision in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), established the factors an ALJ should consider when evaluating the credibility of subjective complaints.  Because "questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the [Commissioner] to decide," our review is limited to determining whether the ALJ considered all the evidence relevant to Blakeman's complaints of disabling fatigue and whether that evidence contradicted his account sufficiently that the ALJ could discount his testimony as not entirely credible.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  After careful review of the record, we affirm.

## I.

Blakeman and members of his family suffer from hypertrophic obstructive cardiomyopathy, a hereditary heart condition also known as idiopathic hypertrophic sub-aortic stenosis or IHSS.  The administrative record includes a medical website's description of the condition submitted by his treating cardiologist, Dr. Kelly Vaughn-Whitley.  The major abnormality is an excessive thickening of the heart muscles, which tends to restrict the amount of blood the heart can hold and eject with each contraction.  The condition is usually apparent by the late teens and stable thereafter,

---

[1]The HON. RICHARD H. BATTEY, United States district judge for the District of South Dakota

although some persons experience worsening symptoms in later life.  Symptoms include shortness of breath, chest pain, palpitations, lightheadedness, and blackouts, symptoms which often have other causes.  Blakeman, for example, is obese and was a heavy smoker until he reduced his smoking to a few cigarettes per day in recent years.  The effects of IHSS vary greatly.  Those with severe symptoms face the risk of heart block and even sudden death.  IHSS is commonly treated with medications, a pacemaker implant, and in severe cases heart surgery.

After Blakeman received a pacemaker implant in early 1995, his doctor advised that he could return to normal activities.  He returned to his sporadic work as a truck driver, maintenance worker, and carpenter, working as much as ten hours per day at these jobs after the alleged disability onset date, October 1, 1997.  He did not report for recommended periodic checks of his pacemaker until September 1998, when his brother died, possibly from a pacemaker malfunction.  At that time, he told the doctor he did not have any particular problems.  From July 1999 to October 2000, he performed strenuous mobile home warranty repair work for his brother's business.  The ALJ noted that he stopped this work "for reasons not related to his allegedly disabling impairments."

At a July 2001 disability examination, Blakeman noted "activity intolerance" and complained of "frequent episodes of feeling tired and having dizzy spells."  The examining physician, Dr. Paul Johnson, opined that Blakeman "could sit or stand for up to 8 hours a day for work, but he is not capable of any lifting or carrying activities" because of the "great risk" of sudden death from his heart condition.  Dr. Johnson saw Blakeman again in October 2001 when he complained of low back pain after "working on his vehicle." Dr. Johnson prescribed rest and medications, observing that Blakeman was a "[h]ealthy male in no acute distress."

In September 2001, Blakeman returned to Dr. Vaughn-Whitley complaining of extreme fatigue that increased with activity and episodes of dizziness, blurred vision,

heart palpitations, and near black-outs. He reported that "he is unable to maintain a job" because of fatigue and other symptoms. The clinic prescribed medications and reprogrammed his pacemaker in November. In May 2002, Blakeman reported that his dizziness and palpitations improved after the pacemaker was reprogrammed and that he exercised a half-hour each morning. His pacemaker was at the end of its useful life. It was replaced with an AICD device because of his heart condition. The physician's report described him as a "[w]ell-developed, obese, tired-appearing male currently in no apparent distress." When Dr. Vaughn-Whitley checked the AICD device in July 2002, Blakeman had "no particular complaints." In November 2002, when he reported episodes of dizziness at the end of the day, Dr. Vaughn-Whitley adjusted the AICD. In August 2003, Blakeman reported fatigue, dizzy spells with temporary loss of vision, shortness of breath, and trouble sleeping. Dr. Vaughn-Whitley prescribed medications and again adjusted the AICD.

In November 2003, in response to a request from Blakeman's attorney, Dr. Vaughn-Whitley opined that Blakeman's heart condition limited him to "episodes" of less than fifteen minutes walking, fifteen minutes standing, and thirty minutes sitting. The letter did not state how many such episodes Blakeman could tolerate in an eight-hour day. That same month, Dr. Larry Vander Woude performed a residual functional capacity assessment in connection with Blakeman's disability claim. Dr. Vander Woude opined that Blakeman could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk six hours in an eight-hour workday with frequent breaks, and sit six hours in an eight-hour workday. Dr. Vander Woude noted Dr. Vaughn-Whitley's opinion that Blakeman's capacity for walking, standing, and sitting was more limited because of his heart condition. A third physician performed another residual functional capacity assessment in February 2004, agreeing with Dr. Vander Woude as to Blakeman's capacity to walk, stand, and sit and opining there was "no basis" for Dr. Vaughn-Whitley's more limited opinion.

In August 2004, Blakeman arrived a day early for an appointment with Dr. Vaughn-Whitley. He refused to reschedule the appointment, declaring that it was unnecessary because he had no problems and that he would come back in six months or a year. However, he visited Dr. Vaughn-Whitley in October 2004 complaining of dizziness, shortness of breath with orthopnea,[2] and dyspnea[3] from walking 300 feet to Wal-Mart. Dr. Vaughn-Whitley suspected his heart condition was the cause of these symptoms and reprogrammed his AICD pacemaker.

At the December 2004 hearing, Blakeman testified that fatigue from his heart condition is the primary reason he feels he is disabled. He helps with household chores and grocery shopping, drives a car infrequently for short distances, reads and plays cards for hobbies, and attends church but not regularly. He naps one or two hours each afternoon, has dizzy spells most days, and is short of breath after walking twenty or thirty feet.

The other witness at the hearing was vocational expert William Tysdal. The ALJ recognized that Blakeman's heart condition is a severe impairment and therefore a vocational expert was needed to help complete steps four and five of the evaluation process, the determination of whether Blakeman has the residual functional capacity ("RFC") to perform his past relevant work, and if not, whether the Social Security Administration met its burden to show that Blakeman has the RFC and the skills needed to perform "other work [that] exists in significant numbers in the national economy." See 20 C.F.R. §§ 404.1520, 404.1560, 416.920, 416.960.

---

[2]Orthopnea is "inability to breathe except in an upright position (as in congestive heart failure)." Webster's Third New International Dictionary 1594-95.

[3]Dyspnea is "difficult or labored respiration." Webster's Third New International Dictionary 712.

The ALJ asked Tysdal whether jobs exist in significant numbers in the national or regional economies for a worker of Blakeman's age, education, and prior work experience who has the following RFC: stand or walk for four hours and sit for at least four hours in an eight-hour day if allowed to alternate between these positions; lift and carry up to fifteen pounds occasionally and ten pounds frequently; never climb ladders or scaffolds; occasionally climb stairs, balance, kneel, crouch, and crawl; no concentrated exposure to extreme cold; and no work in places that could damage a pacemaker. Tysdal responded that this hypothetical worker could perform certain unskilled sedentary jobs such as food and beverage order clerk or call-out operator. The ALJ then asked:

> Q. If we assume that this hypothetical worker needs to lie down during the day . . . as you heard from [Blakeman's] testimony, would any of these jobs exist?
>
> A. No.
>
> Q. Would any other jobs exist?
>
> A. No.

Blakeman's attorney then asked Tysdal whether someone with the limitations set forth in Dr. Vaughn-Whitley's November 2003 letter could perform jobs existing in significant numbers in the national economy. Tysdal responded by noting a significant ambiguity in that letter:

> A. . . . [I]f I can just kind of summarize what . . . my feelings are about the limitations, 15 minutes walking, 15 minutes standing, which would be a total of 30 minutes walking and standing, and then 30 minutes sitting. If the individual could perform that throughout an eight-hour workday, then . . . the occupations I identified would be within these limits.

Q. Okay. And it's unclear from the letter, to you, whether that's what she's saying or not . . . ?

A. Well, if you add it up, it looks to me like 30 and 30: 30 minutes walking and standing, 30 minutes sitting . . . it's per episode. There's no limitation per day.

On December 15, 2004, two days after the hearing, Dr. Vaughn-Whitley wrote another letter to Blakeman's attorney that is part of the administrative record. She opined that Blakeman has "multiple medical problems" and "his fatigue could very well be related to any one of these conditions." She then addressed the question of Blakeman's functional capabilities:

> Again, as stated in a letter dated November 5, 2003 Mr. Blakeman is limited as to his ability to perform certain activities. Especially of concern is his ability to perform any job in which he has to be available on a consistent day-to-day basis for long periods of time.
>
> He is able to walk for less than 15 minutes per episode. In fact, at his last visit in October 2004, he informed me he was unable to walk 300 feet without having shortness of breath.
>
> Standing is limited to 15 minutes per episode. Sitting is limited to 30 minutes per episode.

In his February 16, 2005, post-hearing opinion, the ALJ credited Dr. Vaughn-Whitley's opinions as the treating cardiologist but found that Blakeman's "statements concerning his impairments and their impact on his ability to work are not entirely credible." The ALJ then found that Blakeman has the residual functional capacity described in the hypothetical to vocational expert Tysdal: standing or walking four hours and sitting at least four hours in an eight-hour work day (consistent with Dr. Johnson's 2001 disability evaluation and a somewhat greater limitation than Dr. Vander Woude's November 2003 RFC assessment), provided he is able to alternate

between standing, walking, and sitting (consistent with Dr. Vaughn-Whitley's opinion). Based on this functional capacity and the testimony of vocational expert Tysdal, the ALJ found that Blakeman could not perform his past relevant work but retains the capacity to perform other unskilled sedentary jobs such as order clerk or call-out operator and is therefore not disabled.

## II.

On appeal, Blakeman's sole argument is that the ALJ wrongly found his subjective complaint of disabling fatigue not entirely credible. This attacks a subsidiary finding. The ALJ's critical finding, based on medical opinions in the record, was that Blakeman had the RFC to stand or walk for four hours and sit for at least four hours in an eight-hour day, if allowed to alternate between these positions. Vocational expert Tysdal testified that, if Blakeman has that RFC, jobs exist in significant numbers that he can perform. Many workers suffer from fatigue but are able to work, just as many people suffer from chronic pain that is not disabling. The issue is not whether Blakeman's heart condition is fatiguing, it is whether his fatigue is disabling. As in Moad v. Massanari, 260 F.3d 887, 892 (8th Cir. 2001), the ALJ found Blakeman's complaints of fatigue "credible only to the extent consistent with [the ALJ's] RFC findings." That must be our focus.

Blakeman testified that he naps one or two hours each afternoon. The ALJ used this testimony to focus the fatigue inquiry in questioning the vocational expert. Tysdal responded that there are no jobs available for someone whose RFC is limited by a need to lie down during the work day. The issue is not whether Blakeman was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition *compels* him to nap each afternoon.

Blakeman conceded at oral argument that it is "very difficult" to overcome the ALJ's credibility finding for the period beginning with the October 1997 onset date

-8-

and extending into 2003 given the strenuous work Blakeman sporadically performed until October 2000, Dr. Johnson's disability evaluation in July 2001, and the medical reports showing that Blakeman's IHSS condition was stable and being effectively controlled by medications and a pacemaker. However, Blakeman argues, even if his complaints of disabling fatigue were not credible in those early years of the alleged disability period, the medical evidence of disabling fatigue beginning in August 2003 is "extremely powerful" and compels the conclusion that the ALJ's credibility finding for this later period is not supported by substantial evidence.

As Blakeman's attorney recognized at the hearing, the *medical evidence* of disabling fatigue is based upon Dr. Vaughn-Whitley's November 2003 letter, which opined that Blakeman is only capable of walking less than 15 minutes, standing 15 minutes, and sitting 30 minutes "per episode." When asked whether someone with those limitations could perform jobs existing in significant numbers in the national economy, Tysdal responded yes, if the ambiguous reference to "episode" meant a cycle of alternating positions that could be repeated over the course of a work day. After the hearing, Blakeman submitted a post-hearing letter from Dr. Vaughn-Whitley that simply reiterated the limitations set forth in her November 2003 letter. In other words, after identifying at the hearing an ambiguity perceived by the vocational expert to be critical to the claim of *disabling* fatigue, Blakeman submitted a post-hearing letter from the physician that either did not clarify the ambiguity or confirmed the vocational expert's interpretation that the limitation as to walking, standing, and sitting during a sixty-minute episode was consistent with Blakeman being able to stand or walk a total of four hours and sit a total of at least four hours during an eight-hour work day, provided he can alternate positions.

In his post-hearing opinion, the ALJ made the RFC finding and then based his disability determination on Tysdal's testimony logically interpreting Dr. Vaughn-Whitley's opinion as consistent with that RFC. There is other evidence in the record supporting the implicit finding that his IHSS condition has not worsened in recent years to the point that it caused disabling fatigue in late 2003 and 2004, such as Dr.

Vaughn-Whitley's advice in April 2004 that Blakeman needed to become more physically active, Blakeman's refusal to reschedule an appointment with Dr. Vaughn-Whitley in June 2004 because it was unnecessary, and his continuing to smoke while complaining of shortness of breath. After careful review of the administrative record, we conclude that the ALJ's finding discounting Blakeman's complaints of fatigue to the extent inconsistent with the finding of his RFC is "supported by good reasons and substantial evidence." Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). Accordingly, the judgment of the district court is affirmed.

BYE, Circuit Judge, dissenting.

Because the ALJ's decision denying Jeff Blakeman benefits is not supported by the record, I would reverse the judgment of the district court and return with instructions to remand to the Commissioner of the SSA for an award of benefits from August 1, 2003.

I

The majority asserts this Court's focus for review must be on the ALJ's conclusion Blakeman's complaints of fatigue were "credible only to the extent consistent with [the ALJ's] RFC findings." Ante at 8. However, this simply begs the question at issue in this appeal: whether the ALJ's credibility assessment, which formed the basis for his RFC finding is supported by substantial evidence. The ALJ first assessed the credibility of Blakeman's complaints of fatigue and dizziness. Then, based on such determination, the ALJ made the RFC determination. Of course, given this order of analysis, the complaints the ALJ found to be "credible" will be consistent with the RFC findings–those complaints are the sole basis for the RFC finding. The majority's analysis does nothing but confirm what we already knew - that the ALJ discounted Blakeman's complaints of fatigue and, therefore, found he has the RFC "to lift 15 pounds occasionally and 10 pounds frequently, stand and/or walk for 4 hours in an 8-hour workday, [and] sit for 4 hours in an 8-hour workday. . . ." What we have

-10-

been asked to review, however, is whether the ALJ's decision to discount Blakeman's complaints of fatigue and dizziness is substantially supported by evidence in the record.[4] My analysis leads to the conclusion the ALJ's credibility assessment, and, therefore, it's RFC finding, is not supported by substantial evidence in the record with respect to Blakeman's disability from August 1, 2003, going forward.

It is a well-settled principle that if there are any inconsistencies in the evidence as a whole, an ALJ is permitted to disbelieve a plaintiff's subjective complaints. See, e.g., Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989); Conley v. Bowen, 781 F.2d 143, 147, (8th Cir. 1986); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In making this determination, the ALJ must list specific reasons for the finding on credibility, supported by the evidence in the case record. See Soc.Sec. Reg. 96-7p, 1996 WL 374186 at *4. In this case, each of the ALJ's stated reasons for discounting Blakeman's testimony regarding his fatigue and dizziness is not supported by the record.

### A. Blakeman's Failure To Take Medication For Fatigue

The ALJ noted, despite his complaints of fatigue and dizziness, Blakeman takes no medication for fatigue "such as a B-12 shot." R. at 24. There is no evidence in the record that physicians use B-12 shots to treat fatigue resulting from IHSS, nor is there evidence any physician treating Blakeman had recommended he use B-12 shots to treat his symptoms of fatigue and dizziness. In addition, the record establishes Blakeman had been receiving treatment to control and alleviate his fatigue and

---

[4]The majority also maintains "[t]he issue is not whether Blakeman was credible in testifying that he naps each weekday afternoon he is not working," but "whether his heart condition *compels* him to nap each afternoon." Ante at 8. I fail to see how this issue is relevant to our task in this case, which is to determine whether substantial evidence in the record supports the ALJ's stated reasons for discounting Blakeman's credibility. Here, the ALJ's credibility was not based on finding Blakeman's heart condition did not compel him to nap each afternoon.

-11-

dizziness, along with his other symptoms. As explained in the record, IHSS is a heart condition in which there is an excessive thickening of the heart muscle. The condition reduces the area where blood flows out of the heart and through the aortic valve (the outflow tract), causing turbulent flow and sometimes obstruction to flow which results in the excessive speed and force of heart contractions. Various drugs are used to treat the disease, such as beta blockers, which ease symptoms by slowing the heart's pumping action, and calcium channel blockers, which ease symptoms by relaxing the heart and reducing the blood pressure in it. These drugs ease and control fatigue, dizziness, and other similar symptoms by treating the underlying cause of the fatigue—the excessive speed and force of his heart contractions.

The record shows, since August of 2003, Blakeman has been receiving treatment and taking medication for his fatigue by treating the underlying cause of the fatigue—the excessive speed and force of his heart contractions. In August of 2003, in an effort to alleviate his symptoms of fatigue and dizziness, Blakeman began taking Cardizem to suppress episodes of abnormally fast hearth rhythms and accelerated blood flow across the outflow tract and aortic valve area of his heart. R. at 226, 229. Blakeman did not respond to the Cardizem and, therefore, in January of 2004, Dr. Vaughn-Whitley started Blakeman on Verapamil, a calcium antagonist which, "like beta-blockers, reduces symptoms such as chest pain, breathlessness and palpitations" and "can cause excessive slowing of the heart rate and lower blood pressure." R. at 278. At the time of the hearing, Blakeman was still taking Verapamil. Thus, the ALJ's conclusion Blakeman is not taking medication for his fatigue is not only unsupported by the record, it is contradicted by it.

B. *Blakeman's Ability To Walk 300 Feet*

The ALJ discredited Blakeman's testimony about his limited ability to walk, finding, although Blakeman testified he could not walk more than twenty to thirty feet and now has to use a cane, he made "no such complaints or allegations to his physician but rather reported he was unable to walk 300 feet without having shortness

-12-

of breath," to which Dr. Vaughn-Whitley responded, "lose weight and try to get more physically active." The ALJ incorrectly concluded Blakeman's testimony was contradicted by the record.

Contrary to the ALJ's conclusion, the record shows Blakeman did complain to his doctors he could not walk more than twenty to thirty feet without a cane or something to lean against. Blakeman complained to Dr. Vaughn-Whitley about an increase in fatigue with activity. Id. at 236. He told her activities, such as walking, had been exacerbating his fatigue and dizziness. Id. He noted, as an example, that "walk[ing] from the parking lot into WalMart" would exacerbate his symptoms. Id. Blakeman also explained the severity of his symptoms varied from day to day. He indicated on some days he might be able to walk one block. Id. In 2004, Blakeman indicated he was able to "walk behind a cart at WalMart," but could not "ambulate very far if no cart [was] available for support." Id. at 251.

Moreover, Blakeman's testimony does not contradict his physician's report he "was unable to walk 300 feet without having shortness of breath." Id. at 262. Blakeman testified at the hearing before the ALJ: "In feet, I would say [I can walk] 20 or 30 feet, but I started using a cane, and it seems like if I pace myself and go a lot slower, I can walk a little farther." Id. at 333. If one is short of breath at twenty feet, they will assuredly be short of breath at 300 feet. If anything, Blakeman's concession that he can walk farther than twenty feet if he moves slower and uses a cane shows he was being forthright and supports the veracity of both statements.

Finally, the ALJ's reliance on Dr. Vaughn-Whitley's statement to Blakeman to "lose weight and try to get more physically active" is wholly misplaced. Dr. Vaughn-Whitley's statement was made in response to Blakeman's complaints about his back pain and there is nothing in the record showing Dr. Vaughn-Whitley ever responded in this manner when Blakeman complained of fatigue or dizziness.

-13-

*C. Blakeman's Testimony About His "Extremely Uneventful Lifestyle"*

With respect to Blakeman's testimony on what the ALJ characterized as his "extremely uneventful lifestyle," the ALJ noted it was:

> interesting . . . that [Blakeman] is able to lose some weight over the last few months given his testimony of such an extremely uneventful lifestyle, a description contrary to his treating physician's recommendation to increase his physical activity, as well as in conflict with the claimant's other reports . . . including but not limited to such activities as 'working on his vehicle' and dyspnea especially while shopping or trying to keep up with his children.

R. at 25. The medical records show Blakeman's recorded weight varied as follows in the months leading up to the 2004 hearing before the ALJ:

| | |
|---|---|
| October 12, 2004 | 255.5 pounds |
| April 27, 2004 | 260 pounds |
| April 1, 2004 | 264 pounds |
| February 26, 2004 | 262 pounds |
| January 27, 2004 | 260 pounds |
| January 24, 2004 | 262 pounds |
| December 31, 2003 | 259 pounds |
| December 3, 2003 | 259 pounds |
| October 1, 2003 | 258 pounds |
| August 11, 2003 | 253 pounds |

At most, the ALJ is referring to 8.5 pound drop from April 1, 2004, to October 12, 2004, a 3.2% weight loss over seven months. This is hardly remarkable. Further,

-14-

because one can lose weight by reducing caloric intake or limiting fat consumption without increased physical activity, Blakeman's weight loss does not contradict his testimony about his extreme fatigue and dizziness. In addition, I fail to see how Dr. Vaughn-Whitley's statement Blakeman needs to get more physically active contradicts Blakeman's testimony about his fatigue and dizziness and his limited ability to do physical activity. If anything, Dr. Vaughn-Whitley's statement supports Blakeman's testimony.

The ALJ next found Blakeman's testimony about his "extremely uneventful lifestyle" was contradicted by evidence in the record showing Blakeman had been working on his vehicle. Specifically, on October 30, 2001, Blakeman sought medical treatment for low back pain and the doctor noted, "He was working on his vehicle and noted shortly afterwards he had tightness and back pain." R. at 158. This vague statement about one instance of activity in 2001 does not contradict Blakeman's testimony. As the ALJ noted, the record does not indicate what type of work was involved. According to the ALJ, "activities of stooping or kneeling could be a possible assumption." Id. at 21. Even if this "could be a possible assumption," other types of activities could just as likely be assumed. There is simply no way to know, with any degree of confidence, what type of activities were involved. Further, I do not believe one isolated event of "stooping or kneeling" is inconsistent with Blakeman's claims of extreme fatigue and dizziness or inconsistent with his "extremely uneventful lifestyle." Blakeman has never claimed to be totally incapacitated. To the contrary, he claims his ability to engage in physical activity is limited by his fatigue and dizziness and that on some days he is able to engage in more strenuous activity than on others, depending on the severity of his fatigue and dizziness. Stooping or kneeling for a limited period of time on one given day is hardly inconsistent with Blakeman's claims.

The ALJ also pointed to Blakeman's statements that he went shopping and tried to keep up with his children as evidence Blakeman was lying about his fatigue and dizziness. See id. at 25. The record, however, does not support this conclusion. In

-15-

May of 2002, Dr. Vaughn-Whitley summarized Blakeman's symptoms as follows: "He does have some [shortness of breath] on exertion, some days worse than others. He notices this especially while shopping or trying to keep up with his children." Id. at 169. This statement is entirely consistent with Blakeman's claim of fatigue. If the ALJ is trying to suggest anyone who can shop or tries to keep up with their children can work eight hours, five days a week, such suggestion is simply absurd at best. See Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995) ("[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a Claimant can perform full time competitive work.").

*D. Consistency Of Blakeman's Complaints*

The ALJ also based the credibility determination on its finding Blakeman's complaints of dizziness were inconsistent. R. at 25. Specifically, the ALJ stated:

> While [Blakeman] alleges dizzy spells, elsewhere claimant reports such only upon standing and that such lasted only several seconds (Ex. 4F), and later reported only some episodes but such only occurred at the end of the day (Ex. 7F/11) and later still that he had no syncopal episode for greater than four months.

Id. The intensity and duration of Blakeman's symptoms varying over the course of several years is not surprising, nor is such a basis upon which to discount Blakeman's testimony. Contrary to the ALJ's finding, the law recognizes "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms." Soc. Sec. Reg. 97-7p. Further, the ALJ's suggestion Blakeman's complaints of dizziness should be discredited because he "had no syncopal episode for greater than four months" is erroneous. R. at 25. A "syncopal episode" means fainting or losing consciousness. A person can have dizzy spells without fainting or losing consciousness. I fail to see

-16-

how Blakeman's continuous complaints of dizzy spells makes his testimony less credible.

*E.  Blakeman's Work From October 1997 Through October 2000*

I agree with the ALJ's conclusion about Blakeman's work history from October 1997 through October 2000 involving functional capability "somewhat greater than the claimant has generally reported, and that [he] stopped his warrant maintenance work for reasons not related to his allegedly disabling impairments."  R. at 24.  But Blakeman's minimal work history in 1997-2000 is not good cause for challenging veracity of his self-reports in 2001-2004.  Further, a careful reading of the record shows Blakeman was entirely forthright about his work history from the very beginning of the application process for disability benefits.  In fact, in May 2003, he reported to the SSA he became "unable to work" on September 1, 2000, based on his inability to be at work the entire day, be on time, and be adequate.  Id. at 72.  At best, the ALJ should have used the information to adjust the disability onset date to October 2000 or some subsequent date.

*F.  Blakeman's Failure To Follow Treatment Regimen*

The ALJ attacks Blakeman's credibility by enumerating events which the ALJ concluded showed Blakeman did not follow his doctors' advice.  For example, the ALJ noted Blakeman had failed to sign up for telephonic pacemaker checks, and Dr. Vaughn-Whitley ended up signing him up for these checks.  R. at 25.  While Blakeman had not signed up for the pacemaker checks, the record suggests no one ever instructed him to register for them.  For his first pacemaker, the record indicates on February 14, 1995, a Dr. John R. Bedingfield, Jr., noted: "Monthly telephone follow-ups would seem to be unnecessary in that he does not require the pacemaker for normal heart rate purposes and therefore a q. 6 month follow-up was arranged here in the office."  Id. at 196.  After his second pacemaker was installed, his treating physician noted:  "We will see him back in three to four months for a recheck of his

AICD, sooner if he would have problems." Id. at 230. A handwritten nursing note states: "Pt's wife called today wondering about life watch call / does he still need to have phone checks / discussed with Dr. Whitely / pt has AICD does not need life watch check / pt was called and informed." Id. at 240.

The ALJ also cited one instance where Blakeman refused to schedule a timely follow-up appointment. R. at 25. While Blakeman did state he refused to schedule such an appointment, he did, in fact, schedule, and attend, a follow-up appointment. Id. at 260. The record shows on July 12, 2004, Blakeman had an appointment with a cardiologist whom Dr. Vaughn-Whitley had referred. Id. Moreover, the ALJ noted although Blakeman testified he generally sees a doctor every month for his IHSS and his AICD, the record indicated otherwise. Id. at 25. The record, however, shows Blakeman was seen by doctors on August 11, September 11, October 13, and November 5, 2003, and January 22, 28, February 26, April 27, July 12, and October 12, 2004. See id. at 219, 221-22, 223, 225, 226-27, 229, 235-48, 254, 260. This record is entirely consistent with Blakeman's testimony about generally going to the doctor every month but, while at the time of the ALJ hearing, it had been about three months.

The ALJ also relied on some reports in the record of Blakeman refusing to go to the emergency room (after nurses instructed him to do so over the phone) and missing appointments. Id. at 240. The record shows Blakeman refused to go to the emergency room and missed appointments due to a lack of insurance. The nursing notes from Dr. Vaughn-Whitley's examination of Blakeman on August 8, 2003, state "[p]t. has ref[used] numerous times to go to ER [and] also has canc[elled] numerous AICD appt. here due to lack of ins[urance] or T-19." Id. The "T-19" notation is a reference to authorization under Title 19 of the SSA, or Medicaid.

An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering . . . information in the case record, that may explain

-18-

infrequent or irregular medical visits or failure to seek medical treatment," such as "[t]he individuals [inability] to afford treatment [or obtain] access to free or low-cost medical services." Soc. Sec. Reg. 96-7p. Here, the record provided information explaining Blakeman's missed appointments were due to a lack of insurance or guarantee he would be reimbursed by Medicaid. It was, therefore, error for the ALJ to discount the credibility of Blakeman's statements of fatigue and dizziness based on refusal to go to the emergency room and his missed appointments.

The ALJ also pointed to Blakeman's failure to pursue physical therapy for his shoulder injury, stating, "No records indicate claimant complied with a January 2004 recommendation [from a Dr. Kevin Brown that] he pursue physical therapy." R. at 22. This is false. Dr. Vaughn-Whitely noted in February 2004, "He's been doing [physical therapy] on his shoulder in Belle Fourche [Family Medical Center]." Id. at 254. Thus, the record actually demonstrates the opposite of what the ALJ concluded.

Finally, the ALJ attacked the credibility of Blakeman's statements about his fatigue and dizziness on the ground he continued to smoke despite complaining of shortness of breath. The ALJ cited Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) and Sias v. Secretary of Health and Human Services, 861 F.2d 475 (6th Cir. 1988) (per curiam), for the proposition Blakeman failed to heed the advice of his doctors. There is no evidence in the record which shows Blakeman's doctor ever expressly told him to quit smoking. On July 16, 2001, there is one notation from Dr. Paul Johnson, a family practice doctor: "Meds. Wellbutrin 150 mg b.i.d. for stopping smoking." R. at 158. But there is no consistent recommendation that Blakeman take Wellbutrin, an antidepressant, and no prescription for Wellbutrin within two years of the hearing before the ALJ. Further, there is nothing in the record suggesting smoking cessation would alleviate any of the symptoms suffered by Blakeman. The information in the record about IHSS does not list smoking cessation under its "General Advice" category, despite advising a person with IHSS to engage in "sensible eating habits" and alcohol moderation. Id. at 282.

In addition to the lack of evidence in the record linking any of his symptoms with smoking, the record shows Blakeman had quit smoking prior to the hearing before the ALJ. In July 2002, he reported smoking what Dr. Vaughn-Whitley characterized as "only" five cigarettes a day. Id. at 230. On October 1, 2003, he reported he was not smoking but was exposed to second hand smoke on occasion. Id. at 213. Given Blakeman did seek treatment and follow the treatment regimen for his underlying heart condition, his "failure to stop smoking . . . [does] not show that [his] complaints were not credible." O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

## II

Much of the evidence cited by the ALJ to discredit Blakeman's subjective complaints of fatigue and dizziness is not supported by the record. In fact, some of the evidence actually bolsters the conclusion Blakeman is telling the truth. Here, "[t]he record as a whole, including [Blakeman's] testimony and all of the medical records, corroborates [Blakeman's] subjective complaints in such a qualitative manner as to negate the inconsistencies pointed out by the ALJ." Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001). The activities Blakeman had been performing, including work he may have done on his vehicle in 2001, do not demonstrate his testimony as to fatigue and dizziness was untruthful. See, e.g., Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005) (noting discounting claimant's subjective complaints not appropriate merely because her "activities of daily living involved some light exertional activities, such as household chores, laundry, grocery shopping, mowing, and other chores"); cf. Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996) (making bed, preparing food, performing light housekeeping, grocery shopping, and visiting friends not substantial evidence claimant could perform competitive work); Rainey v. Dep't of Health & Human Servs., 48 F.3d 292, 203 (8th Cir. 1995) (finding washing dishes, light cooking, reading, watching television, visiting mother, and driving to shop for groceries were not substantial evidence of the ability to do

full-time, competitive work).  Therefore, the decision of the district court should be reversed.

The only remaining question, then, is whether the case should be remanded to the ALJ for further proceedings consistent with the court's opinion or with instructions to award benefits.  Where the total record convincingly establishes disability and further hearing would merely delay the receipt of benefits, this court has ordered the immediate award of benefits without further proceedings.  See, e.g., Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1996); Jeffrey v. Sec'y of Health & Human Servs., 849 F.2d 1129, 1133 (8th Cir. 1988); Beeler v. Bowen, 833 F.2d 124, 127-28 (8th Cir. 1987).  Where "the hypothetical question posed to the vocational expert was inextricably intertwined with the ALJ's credibility findings, perforce there must be posed to a vocational expert hypothetical questions based on findings entered after a consideration of the evidence that the ALJ failed to take into account." Baumgarten, 75 F.3d at 370.  In this case, the ALJ did pose an alternative hypothetical question to the vocational expert as to whether any jobs would exist in significant numbers in the national or regional economy that a person who needed to lie down during the day could perform, "as was—as you heard from the Claimant's testimony." R. at 339-340.  The vocational expert responded, "They would not, no." Id. at 340.  Given this testimony, I think the record is clear the SSA did not meet its burden of showing Blakeman could still work and remand for further proceedings is, therefore, unnecessary.  Moreover, the record clearly demonstrates the onset date of Blakeman's disability was August 1, 2003.  Therefore, I would remand to the ALJ with instructions for an award of benefits from August 1, 2003, going forward.

III

Because I do not view the ALJ's credibility assessment as being supported by the record and because I find such record establishes Blakeman became disabled in August of 2003, I respectfully dissent.

_____